At this time, we'll hear Fernandez v. Capra. Good morning, your honors, and may it please the court. I would like to reserve one minute for rebuttal. I'm Maya Lichtenstein. I am an associate at Paul Weiss, and we represent Mr. Pablo Fernandez and his habeas proceedings. The state court decisions denying Mr. Fernandez's prosecutorial misconduct claims were unreasonable applications of clearly established federal law. We therefore ask this court to grant Mr. Fernandez's petition on each independent claim and grant Mr. Fernandez a new trial. Starting with the Brady claim, the first department committed an egregious error when it applied the wrong standard for evaluating the materiality prong of Mr. Fernandez's Brady claim. The state suppressed evidence that Molino, the lead investigating officer in Mr. Fernandez's case, was a corrupt drug dealer who was caught on tape negotiating the sale of a half kilo of cocaine to an undercover officer. The state had this information before the end of Mr. Fernandez's trial, but did not disclose it until nine days after Mr. Fernandez's trial. Well, you're asserting that, and I grant you it's a viable argument, but the person making the inquiry, Mr. Burmeister, was conducting an investigation and satisfied himself categorically that Molino had been a drug dealer before he became a cop. On the very day of the conviction, February 6th, because that's the day that he encountered the trooper who made the arrest. So it's not really possible to say that the state was sitting on this or concealing it. And if you get to prejudice, that's a stronger argument, but you need really to establish the offense in the first place. And it is clear that the state did have this evidence in its possession before the end of trial. Regardless of the amount of time it took ADA Burmeister to review the evidence, and also regardless of his skepticism that there could have been allegations like this against Molino for so many years without an arrest. First, United States v. Brooks and United States v. Auden are instructive on the point about the amount of time it took him to review the evidence. If a Brady violation is triggered by information that the prosecution never reviewed because of shortness of time, as in Auden, or because the state didn't think they would find anything if they looked, as in Brooks, then it is irrelevant how long it took ADA Burmeister to decide that the evidence was reliable. As soon as he was put on notice of its existence by the NYPD, the Brady obligation was triggered. It cannot be that a prosecutor's responsibility under Brady is greater in relation to information that he never finds, as in Brooks or Auden, than for information he knows about and can easily access. And in addition, on the point of . . . I'm sorry. Finish your answer and then I'll put my question. Go ahead. And to address the point about Burmeister's skepticism, before he finished reviewing the audio tapes, Judge Crocker Snyder was incorrect when she found that the Brady obligation was of Brady into Simone v. Phillips, the judgment of the state cannot be substituted for that of the defense. And in this case, the evidence that the state had access to was objectively reliable. And in fact, it was so objectively reliable that Molina was arrested immediately after Burmeister finished reviewing the material without any further investigation or any confirmation. And so from the moment the state was put on notice of that, of the existence of the evidence by a reliable source, by the NYPD, who had learned of it from the New York state troopers and not from an unreliable informant, as in the cases that the state cites, the Brady obligation was triggered. So . . . before the conviction. Does the materiality, the effect of it, get tested by what was known about witnesses then or by the fact that later some tried to recant, which the lawyer would have to decide how important this data is? The information, the impeachment evidence against Molina was material, even putting aside whether this court credits the recant, or whether the state court credits the recantations or not. Evidence that a police officer engaged in unrelated misconduct is exactly the kind of information that courts find to be material. For example, in Arnold v. McNeil, a case affirmed by the Eleventh Circuit, the court found that evidence of unrelated misconduct by a police officer could certainly have introduced doubt into the minds of at least one juror. And furthermore, that the witness . . . the identifications by witnesses that had interacted with that police officer could be called into question, again, because of unrelated misconduct by a police officer. So even without looking to the recantations . . . Because the allegations in part by the recanting witnesses were that they were told by the crooked officer to, you know, here's a photograph or here's the guy you should pick out or things like that, which would have been more credible if they had known at the time if the officers were involved in that particular problem. Exactly. So in this case, when evaluating the materiality of the impeachment evidence against Molino, we have a better insight into what might have happened at trial if the state had disclosed this evidence prior to the end of trial. So for example, with the three recanting eyewitnesses . . . with the three recanting eyewitnesses, the defense could have recalled each of those witnesses. And in this particular case, we know what they would have said, as Your Honor pointed out. They would have said that they identified Mr. Fernandez because of pressure from Molino. And in addition, in evaluating the materiality of the evidence against Molino, context matters. And in this case, the state court found that if he were to credit just one of the eyewitness recantations, just the recantation of Cannella, then he would have to grant Mr. Fernandez a new trial. So let me ask you on that score. Assuming, for the sake of argument, that we were to find that the judge erred in not having any real reason for disputing Mr. Cannella's recantation, just that, is that sufficient in a state habeas case to warrant reversal? So if I understand your question, it's if we were to credit just Cannella's recantation, would that be enough to warrant reversal? Right. Yes. And that is exactly what the state court said in its opinion, that the case was weak enough that it could rise or fall on the strength of just one eyewitness. And had the defense been able to use the impeachment evidence against Molino in the context of such a weak case, it is clear that there's a reasonable probability that this could have led to a different result. And that is the standard which this court needs, which for Brady materiality, unfortunately the first department applied the wrong standard. They held that there was no reasonable probability that Mr. Fernandez would have been acquitted if the information had been disclosed. And the standard instead is whether there is a reasonable probability of any different result, including introducing doubt into the minds of just one juror and leading to a hung jury. And we submit that that is exactly what would have happened here if the state had fulfilled their obligations under Brady and disclosed the information to Mr. Fernandez. The Trump court also denied the claim because on the ground that even if the disclosure of the crooked cop had been made, it would not have been material given the overwhelming evidence supporting Fernandez's guilt. Now, I do understand you're saying that if, that I think your argument is that at the same time the state court said that if you credited Fernandez's recantation, the evidence would have been weak. How do you reconcile these things? So there were two separate opinions. There was the opinion on the Brady claim, which occurred before Mr. Cannella's recantation, and then the opinion evaluating Cannella's recantation many years later. But we submit that this court should consider all of the evidence because as the Supreme Court recognized in U.S. v. Bagley, evaluating the materiality of evidence which was not disclosed is a difficult exercise, but it is a retrospective exercise and that's why the standard is what there was a reasonable probability of. The state deprived us of the opportunity to know exactly what would have happened if Mr. Fernandez had the information about Molino, but in this case we know what the witnesses would have said had they been asked the right questions because of the later recantation hearings. You've reserved a minute to rebuttal? Yes. We will hear you then. Thank you. May it please the court, my name is Sheila O'Shea and I represent the respondent on this appeal. With respect to the triggering of the Brady claim, no one disputes that the government has no Brady obligation to communicate preliminary or speculative information, but as Magistrate Judge Gorenstein pointed out, I think it's critical to bring to the court's notice I did no Supreme Court case laws suggesting that the prosecution must pursue preliminary information on any particular timetable. You're calling it preliminary information. On the other hand, the state troopers advised the police that there was this conviction. I mean, if your argument is correct, then if the state trooper actually did the arrest, had retired and moved to Florida and they couldn't find that person, then they'd never have to disclose that. They'd never have to disclose the conviction because they would not have had the final, absolute confirmation that this police officer was a bad apple. Well, if I may, I'd just like to review briefly, and your Honor seems well aware with the chronology and how quickly ADA Burmeister did, in fact, review the tapes. He became aware of the information regarding Molino's arrest on January 30th. On February 2nd, he scheduled a meeting with the officers who had met with the state troopers. That meeting occurred on February 5th. At that time, he asked to review any tapes and to meet with the undercover. He met with the undercover the following day, and then on the 7th, the undercover didn't bring copies of the tapes that day. So on the 7th, he received them. He immediately reviewed them that afternoon, that evening, and the following morning, and he promptly ordered Molino's arrest. So again, I think the state courts were reasonable to allow the people a brief period of time in light of the lack of guidance from the Supreme Court on, again, the appropriate timetable in these circumstances. It's just unfortunate that this happened right around the time that Molino was testifying at trial and the defendant was convicted. Talking about timing, let's talk a little bit about Mr. Cannella. So as I understand it, correct me if I'm wrong, over two years after the actual event, after the actual crime, Mr. Molino and one of his colleagues go out at the direction of the prosecutor that trial is either ongoing or about to begin, and they dig up two witnesses, two new alleged eyewitnesses who they've never had before, one of whom is Mr. Cannella. They do not show Mr. Cannella a photo array or a lineup or anything like that. They just bring him right into court a few days later, and according to Mr. Cannella, they showed him a photograph and told him who to pick out, but putting that aside, they bring him in to court and mirabiladictu, he is able to identify the guy sitting at the defense table as the defendant, as the person he saw commit the crime. He then recants. He tells his wife that he perjured himself. He tells the defense investigator, he breaks down in tears with the defense investigator, and ultimately he comes into court and says, I lied and I've been feeling guilty about it ever since, and the judge says, oh, I don't believe Mr. Cannella because, quote, he came across as someone who was trying too hard to be convincing, and please don't make any arguments now because you might be trying too hard to be convincing and I would have to discredit you, and then the judge says, again, I don't believe Mr. Cannella because he could not explain why he had waited so long to come forward, as if people all the time come forward to admit that they committed perjury, and that the court would expect him to notify the authorities rather than wait in silence. None of that makes any sense to me, to be frank. Well, with due respect, it makes sense to me, and I think Cannella's testimony was incredibly blunt in many respects, and it was also contradicted by Detective Tevins. Again, he said he was wracked with guilt for all this time, he waited 16 years after the shooting and 13 years after the conviction to come forward. Again, I think... The judge found that he had no motive to lie, he wasn't bribed, he wasn't seduced, he had a good record, true? Yes, but the judge also noted that, which I think is telling, that he'd re-read Cannella's trial testimony umpteen times and deemed it trustworthy and reliable. How can it be ... What's your explanation for the fact that the judge could even admit as reliable an eyewitness identification two years after the event by someone who wasn't even given a photo array or a line-up, but is simply asked to pick out the person in court? Well, he gave a very solid identification at trial. He saw the petitioner get out of the car, shoot towards the building, get back into the car. How long was that period of time? It was several seconds, but I submit that that's an image that I think would be indelibly marked on one's brain. It's not the kind of thing ... Well, it's the kind of thing you see every day. You didn't note that the National Academy of Science has said that that's not good science? Well, let me just add that he noted during his trial ID that he remembered the petitioner's nose, his eyes, his mouth. He identified a photograph of Mart, who is the person ... I'll bet eyes, nose, and mouth. Now look, think about that. We're talking about someone you saw for a few seconds. We're talking several years later. Its memories have been known to fate. Now, without any line-up, without any attempt to do normal police practice of before you do an in-court identification, he's just being asked to say, isn't that him? How could the judge admit that as reliable? Well, again, I think the quality of the identification, given in conjunction with the quality of the other very strong identifications, his testimony dovetailed with that of the Rosario cousins and Mr. Medina, who gave a very strong identification. Although he did not witness the shooting itself, he noted he vividly recalled the right profile of the petitioner's face, his cheekbones, his eyebrows, his jaw, his nose, and his ear. I submit that's ... Isn't it true ... This is an unfair question, but what the hell. Isn't it true that it's been well-established now that inaccurate eyewitness identifications are the single largest cause of wrongful convictions? Well, Your Honor's in a better position to answer that question than I, and I assume the answer is yes. But let me just go back to a few things that I think Judge Allen rightfully pointed out about Cannella's testimony at the 440 hearing. He said he didn't explain why he went along with this plot, and I think importantly, Cannella vaguely talked about I felt pressure, I felt frightened, but he never said what the police actually did to persuade him to identify someone who was actually innocent. These are pretty persuasive, and they can be intimidating and frightening. I have a slightly different take on what Judge Rakoff is asking. I find it implausible that Cannella would have been put on the stand to identify somebody without there having been some preliminary spade work in the way of a lineup, photo array. It's very, very risky. What prosecutor of sound mind would do that other than one who knew or who prepared the witness to say that the person sitting on the right over in that table is very likely to be the criminal defendant? I think it's unfair to suggest that there was any wrongdoing on the part of the prosecutor. Why is it unfair? We already know that the prosecutor was a bad egg. The prosecutor? That the policeman was a bad egg. If I may, I'd like to go back, and I think this is a roundabout . . . I'm worried about the prosecutor, too, because I can't understand why somebody would put somebody on the stand just to give an in-court identification without any evidence. Any idea of whether the person can identify him. I mean, one nose is pretty much like another nose. Well, again, I can just go back to Judge Allen's remarks that he, having re-read the trial testimony numerous times, deemed that Cannella's testimony had the earmarks of someone who was telling the truth. He's presided at the trial. He presided at the two 440 hearings. I think his credibility determination is entitled to a presumption of correctness. And I'd just like to quickly, given that I've . . . Go right ahead. Yes, thank you, Your Honor. I'd like to return to the materiality point, because I can see that the Court is perhaps somewhat troubled by the notion of when the Brady obligation was triggered. However, on the materiality front, as I've tried to impress with respect to other questions, we had four rock-solid identifications.  Three of which were recanted, but . . . Were incredible on their face and were contradicted by the witness. For example, Cannella said that the police showed him photographs. He'd said at trial they hadn't, and we put on . . . the people put on Detective Timmons to say the police never showed him photographs. He was caught in a direct lie. So I think that . . . Let me ask you a question, which I was going to ask to your adversary, but . . . You can ask it to her if you prefer. As you can see, I'm troubled in part by the notion that you could put witnesses on the stand in an identification without even showing them a lineup or a photo array, but did the defense ever ask for a hearing on that, with this is respect to the two later call witnesses? There was a hearing on the two earlier witnesses. There was a Wade hearing, right, with respect to the Rosarios. I don't believe so. I can't answer that question with certainty, Your Honor. But again, just returning quickly to the materiality point, not only do we have the rock-solid identifications of three eyewitnesses, Medina, who's on the corner when he sees Petitioner car drive by after the shooting, his car is slowed in traffic. He gets a very good look at him. Hickliffe gets a very good look at him because the Petitioner, from 10 feet away, points a gun out the car at a 13-year-old boy. I submit that that would make a huge impression upon anyone. And putting aside the four eyewitnesses, we've got the testimony of the two cooperating witnesses who testified about Mart's plan to hire the Petitioner to execute the murder. He gave them the gun. They testified about, one of them saw Mart paying off the Petitioner, I think it was $2,500, after the murder had committed. And I think very damningly, after the fact, the Petitioner came back to Mart and Rivera and admitted that he'd committed the murder. He showed them a shell casing. He said, you know, I've committed the murder. This is the shell casing I used. And, you know, I killed Quintero and left him like a piece of excrement on the floor. I mean, I think notwithstanding any reliability problems with the cooperating witnesses, all of their prior bad acts were before the jury. I think even if you take aside the three recanting witnesses, I think you've still got a very strong case. I think the people still had a very strong case. Thank you. Thank you, Your Honor. Is there a rebuttal? Very briefly, Your Honor. Very briefly, the State mentioned on the Brady timing issue that this is just a case of unfortunate timing. But the Supreme Court in U.S. v. Giglio said that the State can put in place procedures to avoid bad timing issues just such as this. And in this case, Burmeister did not follow the State's own procedures that were in place to avoid a mishap like this, which led to a grave constitutional error. He testified at the post-trial hearing that he had a policy that whenever he received allegations such as the ones that he heard about Molino, he would find out where the police officer was stationed. He would see if that police officer was scheduled to testify. And if he was, he would call for an adjournment to investigate the allegations and decide if there was a problem or if there was Brady material. And in this case, he didn't do that. So this is not just a case of bad timing. This is a Brady violation. You know, the answer to my question that I put at the very end to your adversary, was did defense counsel make any request for a Wade hearing or Rosario hearing with Rosario a Wade hearing at the time of the trial with respect to the two additional eyewitnesses, the two that had only been rounded up a few days before? I apologize. I don't know if there was a request for a Wade hearing on the two new witnesses. I know there was no Wade hearing on the two new witnesses. Can we find out? Yeah. Can we find out? Certainly. We can try. All right. A way to advise us is by a letter to the clerk of court requesting that it be forwarded to the members of the panel. Let's see if we can do that within a week. Yes, Your Honor. And of course, cooperating with your adversary. We'll coordinate, yes. Thank you very much. Thank you. Thank you. Thank you both. We will reserve decision.